Good morning. I'm pleased to be here on behalf of Kingsville ISD. It's a pleasure to be before you this morning. The issue that I'd like to spend some time on in particular, which I think is very paramount to this appeal, has to do with the concept of deliberate indifference. And in particular because that deliberate indifference standard goes to both jury issues, whether we're talking about the constitutional claim or talking about the Title IX claim. So what I'd like to do first is just talk about the fact that it's appellant's contention that the district court erred in not granting its motion for judgment as a matter of law and also for not granting its renewed motion for judgment as a matter of law after the jury verdict in this case. But in particular, with respect to the deliberate indifference standard, there's a concept associated with whether or not the hiring of this particular teacher was a moving force to the constitutional violation. If the appellee cannot establish that or the plaintiff cannot establish that at trial, then there's no recourse for the plaintiff with respect to the constitutional claim. This Fifth Circuit Court has had a case called Doe v. Edgewood. It's factually similar. It addresses situations of deliberate indifference. And just to give a real quick background on it, in that case, a school district hired a police officer. This police officer's background, he'd been arrested for official oppression of a minor. He was later acquitted of that. And he was disciplined for sexual harassment and advances on a colleague. This happened before that officer was hired by the school district. Now, the school district hires this particular officer in Doe v. Edgewood. And subsequently, that officer touched and groped a female minor student over the course of two years. So the concept of moving force in that opinion was discussed. And it said it's more than a but-for causation, and the hiring administrator's choice to hire that officer without any further investigation of the employment and criminal history was negligent. It wasn't deliberately indifferent conduct, but it was negligent conduct. And this Fifth Circuit concluded that the officer's sexual abuse violated the constitutional rights of that individual, but the hiring policy wasn't the moving force behind the unconstitutional actions. It was the officer's misconduct that was the moving force. The reason I bring that case up is that it's factually almost not identical, but it's factually similar to our situation here. The issue before the jury in our case was whether or not the hiring of this particular teacher was the moving force of the constitutional violation that ultimately occurred, which was the fact that he had exchanged gifts for sexual-type texting and some allegations of some touching. Well, he had done that before. I'm sorry? He had done that before, and the jury heard that. No. The first evidence of him ever exchanging gifts for texting-type situations was with respect to Mr. Voletta, the actual complainant. He had had allegations of an inappropriate behavior with a high school student in 2010, and then when he was rehired in 2015, he had had prior inappropriate relationships and interactions with students. He had had a whole series of inappropriate relationships and interactions with students, like going to things that were not appropriate with alcohol and minors and that sort of thing, right? Respectfully, Your Honor, the— Is that correct? No, respectfully, Your Honor, I don't believe it is correct. With respect to the hiring of this particular individual, prior to that, there were no complaints of sexual misconduct on behalf of this individual. There were no—nothing that was ever established. There were some— There was no complaint that he was ever having an inappropriate behavior towards a high school student from 2010? There were—the allegations were that there weren't any specificities to what kind of allegation had occurred there, whether it was a comment or a special—some type of interaction, but it did not lead to any—it was investigated, it was dealt with, and it didn't lead to any type of disciplinary action on behalf of him. Subsequent— It was for a matter of maybe a couple of days there when they were trying to investigate, but there was inconclusive findings.  But the actual allegations, though, did not have to do with any type of texting or any type of sexual relationship or anything inappropriately from a standard that would put the district on notice that this was some type of sexual predator that was employed by the district. There was just some—and the record, quite frankly, is a little vague with respect to the specificity of that particular interaction. There was no allegation that he was sexually involved with someone or that he had made sexual comments or anything in that regard at the time of which they hired him in 2015. On the verdict, turn to the—let me direct your attention to the—  To the verdict form in the case, the questions put to the jury. The verdict form asked whether the KISD's decision to hire Villarreal was a moving force, correct? That's correct. That it caused plaintiffs to suffer physical abuse. What is your view about the validity of that inquiry? In particular, the one thing that I think is most significant is the hiring of the individual and the incident with Mr. Villarreal. There's a two-year gap period in there. So to say that the constitutional violation of hiring this one individual and then having an incident happen two years later, I believe that there's no proximal cause connection between the actual hiring and the actual event, meaning that it couldn't have been the moving force. There's lots of factors that happened in between that time frame, but— I'm asking you whether or not there was error in failing to ask the jury if jury inquiry should have been into official policy or custom and not simply moving force. Yes, and actually that's a two-part— My question is, was there an objection to the charge? Was there an objection to the charge? Focus on moving force as long or an objection on the basis that no, they must demonstrate an official policy or custom. The charge that was ultimately submitted was a non-objection, but it was agreed to. And no objection to the moving force inquiry? Not—the actual—once the jury charge was established as what you see here, there may have been— there were some objections initially in corroborating what the charge was going to read, but the ultimate charge was no. It was not objective. That was consented. So that was— Sorry, I didn't follow you. But the ultimate— The charge as it reads, that was acknowledged by both parties. That was accepted. There was no objection to the charge as it read. But this was not objected to, the language in the charge? The language in the charge was not objective. That's correct. Whether or not the plaintiff met their burden in the defense opinion with respect to the evidentiary standard to accomplish that, that, of course, is something that we raised objection to when we filed our motion for judgment as a matter of law. But the actual wording of the charge, no. We went back and forth in a charge conference and ultimately agreed to the charge that was submitted. Well, if you agree to submit the question of moving force in a charge and the jury finds against you, you're going to have to show me whether you can come here and say otherwise. We agreed that the standard was applicable and the standard was appropriate, but we had already preserved our objections to the concept that that shouldn't have even gotten to the jury in the first place, which was at the point at which we filed our motion for judgment as a matter of law. And the reason we did that is because the record itself is just quite the opposite. So there's two different points when I'm talking about liberty and difference. One of them is whether or not it was the moving force. Okay. Yes, sir. You're having me again. You're just saying that you didn't object at the charge conference because you had already preserved the point earlier. That is correct, Your Honor. Okay. That was my point. You agreed that the standard is the moving force.  The standard, yes. You're not saying the law standard. You're just saying the facts didn't meet it. And there's insufficient evidence to support it. Correct. Even at the point at which to submit it to the jury. So I don't understand why the facts don't meet it and why we shouldn't defer to the jury. Well, one of the reasons— Start helping me with these facts. Sure, sure. Where there are all these inappropriate communications with students. There are all these grooming-type behaviors and a whole series of inappropriate things that this teacher has been doing and that the board members know about. Well, Your Honor, if I may elaborate on that, right, because it ties into my second issue, whether or not the conduct itself by the school district was deliberate in difference in the first place. And in the Doe case that I referenced, you know, what the district knew in Doe versus what the district knew in Kingsville ISD in our situation here, I think it's very crucial to the analysis. And in Doe, they knew that this gentleman was arrested. He was acquitted. They knew he'd worked for a former employer. They knew there were some references provided. But when we look at what this district had before it, when it was making the decision as to whether or not to hire this individual, the evidence was completely different. And so, in Doe, this court indicated that while there was an inadequately assessed application and perhaps a poor hiring decision, those things constituted negligent decisions, not deliberately indifferent ones. And then if we analogize it to another case in 1993, it's a Fifth Circuit case called Gonzales versus Zuleta, is whether or not the district had turned a blind eye to certain concerns, et cetera, and what was before them when they were evaluating. Our district here realized that this particular individual, he had worked at a former school district for over three years with no complaints. I'm sorry, he worked at our school district for three years without a parental complaint. He worked for a previous one, Bishop ISD, for three years. He got a recommendation immediately before hire from the superintendent of the former district that said he was, and I quote, he was awesome, involved in everything, had to work early, leaves late, great educator. Another administrator gave him a recommendation saying he was creative, had a great mind, was a team player, he'll do a great job in theater arts for KISD. The Kingsville ISD superintendent followed up with Bishop's IAD and called a former colleague, verified this again, spoke to him and said there's no concerns, you should hire this guy. Then the Kingsville ISD superintendent went back and reviewed all the records, all the employment records back from the original hiring of this individual all the way through what they had. Sought approval from the Kingsville ISD legal counsel and told them what the situation was and whether or not the legal counsel believed it was okay to hire this person. Got the green light from them. Then, of course, subsequent to that, upon hire, has him sign a sexual harassment policy, has him watch a video. All these things point to the fact that the school district was not being deliberately indifferent and they weren't turning a blind eye to what was before them. They were making an effort to deliberate and determine whether or not this particular individual was essentially a sexual predator or not. With respect to the deliberate indifference standard, it's appellant's position that the evidence before the court is insufficient to allow it to go to the jury in the first place and insufficient to uphold and support the jury verdict as it stood now. Now, there was also a concept with respect to the fact that if we're evaluating deliberate indifference from a board of trustees, we're not talking about just one particular individual or two. Boards of trustees act as a body conglomerate, so they act together. Well, there were two voting members who voted in favor of hiring this individual, yet there was no record whatsoever of any of their positions or what they knew or what they didn't know associated with the case. Now, that burden falls on the plaintiff to establish whether or not the board of trustees was aware they could have done it through having testimony, examining what those individuals had ever said or what they explained. Those two were Dora Martinez and Brian Koffel, but because you can't tell what those two voting members had any information of, to establish that they drew an inference that this was going to be a substantial risk to students is too far a stretch. The evidence just doesn't support that, and that was our position originally when we made our motion. Part of the responsibility is to have done a proper investigation, and you have to show that the investigation that was done was proper. At the time that all these allegations were being made in 2015, at the time, in Roe v. Cypress Fairbanks School, where there's not evidence of a proper investigation, that went to the jury. That should go to the jury, and this went to the jury because here there's disputes about whether there was a proper investigation done. Just checking the reference is probably not a proper investigation when there are these sexual instances with this contrarian person that's right away after graduation. That's a problem, too, in 2015. The board members themselves know of inappropriate activities of this person while they're voting on it, or else they don't know and it wasn't investigated enough to know. If somebody's immediately dating after graduation, then that means that probably they were, and there were all these rumors going around before graduation. That's a big, huge red flag. Respectfully, and I can appreciate your analysis of that, but if you look at the record— The jury has the right to analyze that. Yes, but the rumors were more argument than factual, than evidence. If you look at the way the evidence shakes out with the testimony themselves throughout the record, that's why it's— And I think we mentioned this in our brief, too. It's a complicated set of facts. What they know today being heard at the courthouse versus what they knew in 2015 when they had the decision to make a hiring decision were two different things. But they did, Your Honor. The only allegations or the only concerns that were brought up were brought up by two particular board members at a board meeting, executive session, when they were evaluating the hiring of this individual. Those two concerns were brought up by Yaklin and Windham. Ms. Yaklin's concern for her own testimony was that she didn't think that this particular individual would commit any sexual behavior with a student, but she was concerned with the fact that he palled around with the cheerleaders a little too much. He was maybe gossiping with them and creating rumors and creating that kind of tension. Secondly, Ms. Windham said when asked if she thought that this board would have known that this gentleman would ever engage in sexual behavior, she said, absolutely not. I just didn't think he was very professional, didn't like what he did. Because of that, they brought that to the attention of the superintendent, who recessed the meeting, went back to conduct a secondary investigation, which is when they were instructed to go look at the records, talk to the general counsel, reinvestigate the references that were done by Bishop Biasdi. Did he investigate whether he had been in a relationship with Contreras as a student? The testimony, not as he was a student, but the testimony that came out even in court was that this happened after he graduated. They moved in with his parents, both the teacher and, not that I consent on this relationship at all, but the teacher and the former student moved in with the parents. The parents had no complaints. They consented to the relationship. There were no concerns ever brought to the forefront of the school district. There was no reason for them to suspect that five, six years later, this particular individual would be exchanging inappropriate texts for gifts with another male student while he was a student at the school district. The evidence just doesn't come out that way. And so, our position here... Good morning, Your Honors, and may it please the court. I had a presentation prepared, and I think I'm going to shift a little bit to respond to some of the questions I heard the court asking Mr. Garza. There is a high burden in these cases. There are not a lot of cases that, frankly, typically end up in a plaintiff's favor. But to arrive at a different conclusion than the jury arrived at in this case, you've got to do what Mr. Garza is asking you and what Kingsville ISD is asking you to do today, which is to look at... How many jurors did you see? I'm sorry? How many jurors did you see? There were eight jurors. Eight? Yes, Your Honor. What Kingsville ISD is asking you to do today and what they are presenting is a litany of some evidence that they believe shows the legitimacy or the adequacy of their investigation. And what they're asking this court to ignore is the mountain of evidence that the jury heard that not only was that investigation at best inadequate, but more likely than not, that investigation didn't occur. There was a discussion of the board meeting and what was discussed at board meetings and a couple of concerns that the superintendent investigated. She called it in her testimony, doing her homework. She testified that in June of 2015, the first meeting at which Mr. Villarreal's employment was discussed, there were two concerns raised. And that was a short meeting that was maybe 15 minutes of executive session where a handful, perhaps five, candidates for employment were presented. The two concerns that Dr. Pettis, the superintendent, says were addressed were one concern by board member Lynn Yoplin regarding the fact of, well, why is Mr. Villarreal hanging out with students at conferences? No allegation of a sexual nature in that. Why is he hanging out with students at conferences too much? And there was another question by another board member that was, why did he leave Kingsville ISD in the first place a few years ago? And so that is where Dr. Pettis says she went home and did her homework and did this investigation. A few problems with that, Lynn Yoplin, there was testimony and evidence, was not at that June 2015 board meeting. She was reported absent on the minute of that meeting. So that's one issue that calls into question the veracity of Dr. Pettis' testimony or the accuracy of her recollection. Dr. Pettis also said as part of her homework, she contacted a counterpart at Bishop ISD, the district from which Mr. Villarreal was coming from, and got a glowing recommendation. Well, there was testimony from Corando Garza, the board president, that says you can't rely on that really because school districts lie to get rid of bad teachers so that they can go somewhere else. So the jury could believe that that wasn't good enough. Dr. Pettis says she instructed her HR director, her HR person at the district, Sharon Mayhawk, to conduct an investigation and to look into Mr. Villarreal's file. Well, Ms. Mayhawk testified, and what she said is, nobody asked me to do any investigation, and I did not do any investigation. Dr. Pettis said she contacted the district's council, and there was no documentation in Mr. Villarreal's file of any investigation or contact or communication with the school district's council. And again, all that happened following the June 2015 minutes-long meeting. From your perspective, the jury could have thought Perez's superintendent was just lying about all this investigation, that there was no contact to the council, there was no request to the subordinate to do an investigation, and that this was made up after the fact? Absolutely, Your Honor. That was your position at trial? That was our position at trial. And more so, when we get to the July 2015 meeting, a month later, where Dr. Pettis presumably comes back having done her homework, that is the 90-minute, heated, as testified by the board members who were there, heated executive session discussing Mr. Villarreal's employment. In that meeting, there was testimony from board members, including Brandon Greenwood, that they discussed the grooming gifts, watches, jewelry, meals, shoes that were given to students in the past by Mr. Villarreal. It wasn't just the plaintiff here, and it wasn't just Contreras? Or was it Contreras? The prior student who testified was Mr. Cuellar, Arnoldo Cuellar. But what Mr. Greenwood testified to is, he was asked that question of, hey, are you sure you're not confusing the gifts that were given to Mr. Loera with prior students? And Mr. Greenwood said, no, I'm certain it was other students. And he fell on his own sword and confessed, I've dated many people. I frequently do the same things, the same gifts that I'll give to people I'm dating. In addition to the gifts, there was testimony that Mr. Villarreal was attending parties and social events with students, minor students. And in fact, board member Fernando Garza said he had heard the same rumor from counterparts at Bishop ISD, where Mr. Villarreal had taught for three years before coming back to Kingsville ISD. The most troubling discussion that was had at that heated 90-minute board meeting executive session was about the relationship with Arnoldo Cuellar, a student who had been at Kingsville or H.M. King High School previously. That was a relationship that was discussed as the board members absolutely knew and had seen evidence and had seen postings that that relationship, at the very least, was publicly romantic within days, if not hours, after Mr. Cuellar crossed the stage a year early at 17 years old, graduating from H.M. King High School. And there was discussion by board member Lynn Yocklin that there's some allegations that maybe that relationship did start before that graduation. And that was discussed at length. At that meeting, Mr. Villarreal was hired on a vote of four to two. So there was no further investigation. There was no investigation at all of those sexual allegations, of that sexual misconduct, of that relationship, of the grooming gifts, of the attending parties with minors. It wasn't an inadequate investigation. There was no investigation of those facts. When you say no investigation of those facts, are you talking about specifically into the relationship between the teacher and the former student, Mr. Cuellar, or are you saying there was absolutely no investigation done whatsoever? So there was no investigation at all into the facts that were discussed or the allegations that were discussed at the July 2015 board meeting because they voted at that board meeting. It was a divided vote of four to two at that board meeting. And so any investigation, if it actually occurred, happened between June 2015 and July 2015 and was limited to the pretense facts that Dr. Fett has testified to having been the homework that she conducted between the two meetings. That's what I'm trying to clarify. Are you saying there was no investigation at all, or are you saying she did homework, she did some investigation, but she didn't investigate the right thing? I think she didn't investigate. I think there was evidence that she did no investigation at all, period. Is calling for a reverence not doing some investigation? If she, in fact, did that, that would be some investigation into a general propriety of hiring a teacher for a position at a school district. But I would argue, and I believe the jury found that that is no investigation. An analogy that I've tried to use before, and it may fall flat because I just can't think of another good one. If somebody asks me to investigate whether the sky is blue, and I come back a month later and I said, well, I can tell you for certain that the grass is green. I've done an investigation. I've gone out and I've looked at the grass and I've compared it to the color wheel, and that grass is, in fact, green. But I have not investigated whether the sky is blue. So doesn't that go to the adequacy of the investigation, rather the existence of an investigation? And I think that you've got to parse it a little more finely than that because you can have an adequate or an inadequate investigation. If they had talked to Mr. Cuellar and he said, oh, well, I'm not supposed to talk about that. I don't want to talk to you, that would have been probably an inadequate investigation into the allegations of a sexual relationship. If they had talked to Mr. Cuellar's parents, if they had talked to other people in the community or in the school district, and had said, hey, maybe we didn't talk to enough people or maybe we didn't talk to the right people or maybe we didn't keep pulling when we felt something was there and we took the yes that we wanted and walked away, that would be an inadequate investigation. But to not ask the question is not an investigation at all is plain disposition, and I believe that's the result that the jury arrived at. So that they did not ever talk to Cuellar. That's correct. That's what was argued. That's correct, and that's just one. They didn't look into the relationship at all. They discussed it at length, and they left it at that, and they were deliberately indifferent to the allegations of which they were aware, and they voted. That's the point that the parents are all very approving and everything is all good. Where does that come in if they did no investigation? Well, so there were parents that Mr. Greenwood testified to that he was receiving concern from other parents. Well, I'm talking about the Cuellar's parents. Your friend on the other side said, well, Cuellar's parents are all good. They're all living together. Everything's good, and there's no problem.  Was that an investigation that told him that? There was no testimony of there being an investigation, and there was no testimony at trial of Mr. Cuellar that I can recall of Mr. Cuellar's parents, certainly not by Mr. Cuellar's parents, and certainly Mr. Cuellar did not testify to his parents being very happy and pleased with the relationship. Can I ask, do you have to win on both the 1983 claim and the Title IX claim to keep your jury verdict? There was a single question of damages that was asked, and the damages are applicable to either or, either the 1983 claim or the Title IX claim. So if you keep one of them, you keep your damages? That's my understanding, Your Honor. Did they argue anything to the contrary? No, and that's why they were submitted in a single question of damages. That's why we didn't have separate questions of damages. And so either shot gets us to the end. What is the verdict form itself? Does it ask whether the decision to hire Villareal was a moving force, or does it ask something further than that, a suspicious policy of custody? So there was much discussion of that and whether or not there was an official policy, and there was a concession or a stipulation, whatever you want to call it, before the court, before the district court at trial, that the board's vote and the board's decision to hire Mr. Villareal was a policy. It's a one-time event, but that decision is a policy. What was the question? I don't have the verdict form. Yeah, that's what I was looking for. Thank you. And so the question was limited to moving force and not a discussion. And that was the agreed-upon verdict form that was submitted. Is that according to the pattern, or you don't know? A lot of it was grown out of the pattern jury charges. There was not much departure from the pattern jury charges. There was some dispute over, and I say discussion rather than dispute, over the specific language and the specific text. But the jury charge that was submitted to the jury, there were no objections to the statement. And there's not an appeal on the charge today? Correct, correct. This is just a factual sufficiency challenge, whether there are facts sufficient to support the jury's verdict that Kingsville ISD had actual knowledge of relevant facts giving rise to a significant risk of substantial harm. And we've discussed already at length the actual knowledge and the things that they discussed and whether or not the board members actually drew that inference. There was some discussion by my colleague about whether or not all six board members who were present at that meeting had to show an actual drawing of that inference or whether or not testimony was necessary of every board member who was there. That is an argument that was raised on appeal and was not raised before the court. There was no motion to dismiss or motion for summary judgment because we didn't have testimony of all six board members who made that vote. But again, the question before the court and before the district court and the jury wasn't did each board member do this. It's did the board who operates as a unit as a whole make this decision and was this tragic circumstance that happened to Mr. Loera a plainly obvious consequence of that decision? This isn't an individual suit against the board members? No, Your Honor. The Kingsville ISD is the sole remaining defendant at trial. And so the question about whether or not each board member has to testify or each board member has to have drawn the inference, again, that's a new argument raised on appeal and I don't believe the court needs to reach that or to address that. But it creates a very perverse loophole. If you've got a board of seven members and you've got one who I'll toe the party line forever, you know, here and now, and I won't testify or I'll always testify to the opposite, then if you don't have a unanimous consensus of the board members saying, yes, I knew this, I agreed to this, I was deliberately indifferent to that, then you could never hold a school district liable because you can't it's unlikely to get unanimous consent or be very difficult. If, for example, a school board member happened to pass away between the vote and trial, well, if you can't bring them to trial, you can't get their testimony, does that mean you can't hold a school district responsible for the vote that was conducted by the group and chose to elect to hire that teacher? And so it's an impossible, perverse standard that I think would be a tragic injustice to address. But I don't think the court has to get there because, again, that's a new argument on appeal. What it comes down to is that there was testimony of what was discussed at that board meeting in July of 2015, and whether or not, you know, one board member believed it or another board member didn't, at the very least, it was a 4-2 vote. If it had been a 3-3 vote, Mr. Villarreal would not have been hired. And we know that Brandon Greenwood, a school board member and subsequent school board president, he said this was one of the worst decisions he's ever made in his life. He knew the facts, he believed that there was a risk, he believed that there was a danger, and he went against his gut, and he voted to hire Mr. Villarreal. And one of the reasons that he did so is because he felt like he was bullied and intimidated by the school board president at the time, Carondo Garza, who just so happened to be a very close and longtime family friend of Mr. Villarreal's parents, and also Mr. Villarreal's parents being administrators and board members in a neighboring school district. And we also had Mr. Garza, Carondo Garza, who testified at trial. You know, he drew the inference sitting there right in front of the jury, talking about Mr. Villarreal attending parties with minor students. He followed right along and said, yeah, that's a danger. Well, why is it a danger? Because you've got teachers who are going to, you know, use that to blur the lines. And what happens if you blur the lines? Well, you're going to get school students who get abused, because they're going to be made vulnerable and made available. And him making that inference sitting there in the witness stand in front of the jury, they were certainly entitled to the conclusion that he drew that same inference years before in 2015, especially given the—but voted anyways because of the relationship that he had with Mr. Villarreal's family. So we know at least two school board members expressly were able to draw that inference. And the jury was free to decide and did in fact decide that the board as a whole drew that inference based on actual knowledge of the substantial risk of significant harm. The absence of an investigation by the superintendent, the evidence suggesting that Dr. Pettis was not fully transparent or truthful with the investigation that she did claim to have conducted, establishes deliberate indifference to the discussion that took place in July 2015. And again, in fact, to parse it out again, there was no further investigation after July 2015. He was hired at the end of that 90-minute heated board meeting. And so if you want to say an investigation occurred, you can't have an investigation of allegations occur before those allegations arise. And so that is again a fine line dividing between the inadequacy of an investigation and the complete absence of an investigation because at July 2015 and forever forward, there was no investigation. What do you think the most important facts are that distinguish this case from the usual case? Because you pointed out yourself at the beginning of your argument that these cases are very hard to get past summary judgment, much less get all the way to the jury verdict because it can't just be negligence. What's the difference in this case? I think there are a few differences, Your Honor. One of them primarily being we have testimony from the board members about what they discussed. So many other cases, the Edgewood case, you've got assault that was reported to or known by the assailant who was a resource officer. And, well, he should know that people aren't breaking the law and he can stop people from breaking the law, so that's knowledge. Well, we've got knowledge here and we've got discussion by the school board. Did the two board members actually say in front of the jury, I was wrong to vote this way and it was a risk at the time and I knew it, but I was bullied or at least one of them said that out loud to the jury. It was a risk. I should not have voted. It was a risk. And not physically before the jury, but Mr. Greenwood testified by deposition. He didn't say those exact words, but what he did say was, you know, worst decision of my life. I went against my gut. He knew that it was a bad decision at the time he was making it, not just in retrospect. And he said he went against his gut because of the intimidation and because of the pressure from Board President Corando Garza. And, you know, you can't go against your gut if you don't have that gut feeling at the time. Did he say he expressed what was in his gut to the board during that meeting? He said that there was much discussion by—he maybe didn't bring it up, but there was much discussion by all of the board members about all of these concerns. But he didn't say that he told the board that. He did say that he talked about the gifts and he knows that there was discussion—the gifts that Mr. Villarreal was giving to other students previously and that there was discussion about the relationship. He didn't have a strong recollection about who brought it up. He knows he brought up the gifts. He believed that Ms. Yocklin may have been the one to bring up the relationship with Cuellar and that there was discussion about it. There was Ms. Windham who voted against hiring Mr. Villarreal as well who discussed some inappropriate and unprofessional social media postings. But regardless of who brought it up, there was discussion that was acknowledged. And the only person who denied that discussion occurring at all was Dr. Perez, whose veracity is under question. And I see that I'm out of time. Thank you, Your Honor. Yes, sir. Do you have the rebuttal? What I think is very clear and apparent here from the discussion from my colleague as well is that several people were not happy with the decision that was made here. But the question when we're talking about deliberate indifference is not the decision, the ultimate decision, but whether or not there was a process in place and whether they turned a blind eye or whether they took some steps to at least try to have a decision-making process in place. And I think that's what the litany of cases from the Fifth Circuit has discussed. And if we look at this one in particular, there was no complaint, by the way, that was necessary to be investigated. So there were some concerns and talks, and that was investigated. Now, whether those investigations and discussions were inept or erroneous or inadequate, that doesn't rise to the level of deliberate indifference. It's whether they decided to do anything whatsoever at all. And the investigation. Perhaps that's the standard. With respect. To do anything at all that it doesn't matter whether it was a good thing or a smart thing. Perhaps a bit of a stretch. Yes. What I meant was that they conducted some investigation, that they did. They took steps that were reasonable with respect to what they knew at the time. I don't think the jury could disbelieve that they took an investigation because they could disbelieve everything that Superintendent Perez said. That wasn't. Because Superintendent Perez had been caught in a bunch of lies, allegedly. But when evaluating whether or not the school district was deliberately indifferent, that's not the only portion of the investigation that took place. What evidence was before the board undisputed, what they had in front of them to make their decisions. But secondly, you heard counsel talk about a heated discussion that took place at one of the board meetings. That heated discussion, that 90-minute discussion, that's deliberation. That's not turn a blind eye and not take any time to consider anything. That's not an investigation either. What it did, it involved a detailed discussion about any concerns that the board members had, which was testified about. The investigation was what happened now because there was a secondary board meeting where they came back. And that was uncontested. In the second board meeting, they came back and reported what they had learned, what they had decided, what they had found out, and that's the board meeting when they voted to hire this particular individual. The opposite, wasn't it the first one was the, and then the second one was the heated one? Discussing the results of the investigation that had been conducted from the first one. The issue was whether there was, in fact, an investigation between the first and the second board meeting and whether or not once this came up at the second board meeting and they learned more things from the other board members, did they say, oh, we've got to go back and look at this, or did they just go ahead and vote? I think the record is complete and full of evidence to support that completely. It was uncontested that there was some investigation. We can use different terms to analogize what that means, but that there was some further work done to put together a decision-making process as to whether or not. What do you mean uncontested investigation? Because I thought it was contested whether or not they talked to the lawyer. Only in argument, but it was contested whether or not it was in paper, whether it was written down. But that evidence is part of the record. It was like any other. And, yes, the same evidence that could be disputed with respect to Mr. Greenwood, who second guesses his decision today, but the question was what was their thought process at the time of the decision in 2015? What is the uncontested evidence in the record? I think the uncontested evidence is before this board they had verified recommendations. They had no history of sexual complaints from anybody at either district or anywhere. They had nothing from any board lawyer or from some third party or front point other than Mr. Greenwood, who in subsequent and testimony of this trial, attempts to argue that there were other things that came to his mind before he actually voted in favor of this particular hire. But I still don't think that you've answered my question. You said they didn't have this, they didn't have that. I asked what was the investigation, the uncontested investigation. You said there was an uncontested investigation. What was that? The uncontested investigation was that the superintendent went back to investigate the complaints of the two trustees. What was brought at issue was whether or not the extent, whether she did a negligent investigation or whether it was inept or erroneous, but an investigation took place. The challenges that were made throughout the trial court record are going to show she went back. What is the uncontested stuff that she did? It is uncontested that she went back to prepare a secondary recommendation from herself based on all the investigations she contained, which is where she went back and investigated the records, spoke to attorneys, put together another packet of information to bring back to the board. That's why they were deliberate. They had something to talk about when they came back the second time. But whether she talked to the people is contested, right? I don't believe it was contested. I don't believe there was no evidence to the contrary. What the challenges were is that they didn't like the sufficiency of what she did. They think she should have done more. She should have turned left when she turned right or asked this question instead of that question. No, that's why we have juries. I'm sorry? No, that's why we have juries, to make common sense judgment. One thing that strikes me when I picked up this case is that it doesn't fall into the normal bar of 1983. It's concerned about imputation of liability to official action. This involves a challenge to the official action directly, the actual decisions by the board. And that really takes off the table a lot of argument about that case. And so on the charges put to the jury, that's a perfectly proper question. That's why I was addressing it. I just want to be real clear with you about at least where I am on this thing. And I think everybody else is, too. But I listen to your argument. You're talking about this person. That's right. But these were official actions of the board that this jury said was not wrong. It was both. Right or wrong. Mr. Garza? Yes. Is the only evidence of this investigation the testimony of the superintendent, Ms. Bettis? In other words, is there evidence that she did call a reference at the prior school district, that she did call legal counsel, that she did review a file? Or is this based solely on her testimony that she did these things? In fairness, I don't believe there was a written piece of paper that's going to verify exactly her phone call. But, of course, she presented a packet completely, which is part of the exhibits that were submitted to the jury. But there's no written documentation saying here's my conversation with a lawyer. It was her testimony about what she went back to go do after she was instructed to do so. Thank you. Thank you. Appreciate it. Thank you very much. Thank you. We appreciate the arguments from Mr. Garza and Mr. West today. And this case is submitted. Thank you.